**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
ERIK O. AUTOR, *et al.*,                            )
                                                    )
                    Plaintiffs,                     )
                                                    )
        v.                                          )        Civil Action No. 11-1593 (ABJ)
                                                    )
REBECCA BLANK, *et al.*,                            )
                                                    )
                    Defendants.                     )
_____)

## MEMORANDUM OPINION

The Department of Commerce ("DOC") and United States Trade Representative ("USTR") have implemented a policy barring federally registered lobbyists from serving on Industry Trade Advisory Committees ("ITACs") – commissions that provide advice on trade policy to the President through the USTR and the Secretary of Commerce.  Plaintiffs are six individuals who previously served or are interested in applying to serve on ITACs, and who were or will be denied membership because they engage in activities that trigger the registration requirements contained in the Lobbying Disclosure Act of 1995 ("LDA").  Compl. [Dkt. # 1] ¶¶ 7–12.

Plaintiffs contend that the policy violates the First and Fifth Amendments of the Constitution of the United States.  *Id.* ¶ 1.  They assert that the policy deprives them of a valuable governmental benefit on the grounds that they have exercised their First Amendment right to petition the government for a redress of grievances.  *Id.* ¶¶ 42–49.  Therefore, they say, the policy both burdens that right and employs an unconstitutional classification that penalizes those who invoke it.  *Id.*

Defendants have moved to dismiss for lack of standing under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  Defs.' Mot. to Dismiss ("Defs.' Mot.") [Dkt. # 8] at 2–3.  Although the Court finds that at least some of plaintiffs have standing to bring their claims, it will grant defendants' motion to dismiss the action because plaintiffs have failed to state a claim that the policy unconstitutionally infringes upon the right to petition the government or that it employs an unlawful classification.

In the Court's view, the plaintiffs have not supplied the necessary predicate for their First Amendment argument because the allegations in the complaint do not establish that service on an ITAC is a valuable government benefit that an individual committee member could receive.  But even if it is, plaintiffs have not been denied that benefit on a basis that infringes upon their constitutionally protected rights and they have not been penalized for or inhibited in the exercise of their rights.  As the complaint specifically reveals, the challenged policy does not condition the receipt of the alleged benefit upon relinquishing the right to petition the government – either as an individual or on behalf of others – and there is no allegation that the opportunity for committee service has been withdrawn in retaliation for any constitutionally protected activity.  Therefore, plaintiffs' action will be dismissed.

## BACKGROUND

The Trade Act of 1974 ("Act"), 19 U.S.C. § 2155, directs the President to "seek information and advice from representative elements of the private sector and the non-Federal sector" with respect to certain aspects of the trade policy of the United States.  *Id.* § 2155(a).  It sets out three tiers of advisory committees to provide this advice.  The first two tiers of committees respectively provide "overall policy advice" and "general policy advice" on trade

issues.  *Id.* § 2155(b), (c)(1).   ITACs fall within the third-tier, consisting of "sectoral or functional advisory committees."  *Id.* § 2155(c)(2); Request for Nominations for the Industry Trade Advisory Committees (ITACs), 75 Fed. Reg. 24584, 24585 (May 5, 2010) ("Nomination Request").  Accordingly, ITACS are structured to include a broad range of industry perspectives. Nomination Request at 24585.  In other words, the members serve solely in a representative capacity.  *Id.*

The committees are organized by the United States Trade Representative and the secretary of the appropriate executive department; in this case, the Secretary of Commerce.  19 U.S.C. § 2155(c)(2); Compl. ¶ 30.  They meet at the request of the USTR and other designated executive officials to provide "policy advice, technical advice and information, and advice on other factors" relevant to the trade matters described in the statute.  19 U.S.C. § 2155(d).  In addition, each committee meets at the conclusion of negotiations for certain trade agreements to provide the President, Congress, and the USTR with a report on the agreement.  *Id.* § 2155(e).  It is the responsibility of the USTR, in conjunction with the appropriate executive department secretary, to adopt the procedures for consulting with and obtaining information and advice from the ITACs.  *Id.* § 2155(i).  The USTR is not bound by the advice or recommendations of the ITACs, but must inform them of significant departures from their advice or recommendations. *Id.*

On September 23, 2009, Deputy Counsel to the President announced on the White House's Open Government Initiative website that "[t]he White House has informed executive agencies and departments that it is our aspiration that federally-registered lobbyists not be appointed to agency boards and commissions."  Compl. ¶ 32.  In accordance with that announcement, plaintiffs allege, the DOC and USTR now require individuals applying for ITAC

membership to provide a statement affirming both that:  (a) the applicant is not a federally registered lobbyist, and (b) if appointed, the applicant will not be able to continue serving as an ITAC member if he or she should become a federally registered lobbyist.  *Id.* ¶ 34.  Furthermore, a recent published announcement for ITAC nominations stated that "the applicant must not be a federally-registered lobbyist."  *Id.* ¶ 35.

What is a "federally-registered lobbyist?"  The LDA requires registration for any individual who is (1) "employed or retained by a client," (2) "for financial or other compensation," (3) "for services that include more than one lobbying contact," (4) unless the individual's lobbying activities "constitute less than twenty percent of the time engaged in the services provided by such individual to that client over a three-month period."  2 U.S.C. § 1602(10).  With some exceptions, a "lobbying contact" is any oral or written communication to a covered executive or legislative branch official on behalf of a client with regard to particular facets of federal legislation, rules, regulations, executive orders, programs, policies, positions, nominations, and confirmations.  *Id.* § 1602(8).

The complaint alleges that five of the six plaintiffs in this case formerly represented members of the private sector on ITACs but were not reappointed because they were federally registered lobbyists.  Compl. ¶¶ 7–12.  The sixth plaintiff, William Reinsch, is allegedly "interested in applying to represent the National Foreign Trade Council ("NFTC") on an ITAC," but given the DOC and USTR policy, "it is clear that Reinsch's application will not be accepted."  *Id.* ¶ 11.

Plaintiffs filed the complaint in this case on September 2, 2011.  The First Cause of Action alleges that the exclusion of federally registered lobbyists from ITACs violates the First Amendment by "denying the benefit of committee service to individuals whose exercise of the

right to petition triggers the LDA's registration requirement, while also interfering with the ability of the entities that seek the services of these lobbyists to communicate their views to the government." Compl. ¶¶ 42–49.  The Second Cause of Action alleges that the policy violates the Equal Protection clause of the Fifth Amendment because it "draws an unconstitutional distinction between those who exercise their right to petition the government and those who do not." *Id.* ¶¶ 50–57.

## STANDARD OF REVIEW

In evaluating a motion to dismiss under either Rule 12(b)(1) or 12(b)(6), the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'"  *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000), quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979) (citations omitted).  Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions.  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002) (citations omitted).

### I.    Subject Matter Jurisdiction

Under Rule 12(b)(1), the plaintiff bears the burden of establishing jurisdiction by a preponderance of the evidence.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Shekoyan v. Sibly Int'l Corp.*, 217 F. Supp. 2d 59, 63 (D.D.C. 2002).  Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. Envtl. Prot. Agency*, 363 F.3d 442, 448 (D.C. Cir. 2004) ("As a court with limited jurisdiction, we begin, and end, with examination of our jurisdiction.").  Because "subject-matter

jurisdiction is an 'Art[icle] III as well as a statutory requirement, . . . no action of the parties can confer subject-matter jurisdiction upon a federal court.'" *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003), quoting *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).

When considering a motion to dismiss for lack of jurisdiction, unlike when deciding a motion to dismiss under Rule 12(b)(6), the court "is not limited to the allegations of the complaint." *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987). Rather, a court "may consider such materials outside the pleadings as it deems appropriate to resolve the question of whether it has jurisdiction in the case." *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000), citing *Herbert v. Nat'l Acad. of Sciences*, 974 F.2d 192, 197 (D.C. Cir. 1992); *see also Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

## II.     Failure to State a Claim

"To survive a [Rule 12(b)(6)] motion to dismiss a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, citing *Twombly*, 550 U.S. at 556. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*, quoting *Twombly*, 550 U.S. at 556. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct,

the complaint has alleged – but it has not 'show[n]' 'that the pleader is entitled to relief.'" *Id.* at 679, quoting Fed. R. Civ. Pro. 8(a)(2).

A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *id.* at 678, quoting *Twombly*, 550 U.S. at 555, and "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.*   In ruling upon a motion to dismiss, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002) (citations omitted).[1]

In evaluating a motion to dismiss a constitutional challenge, the Court must first determine the appropriate level of scrutiny for examining the policy in question.  Classifications made by the government are generally valid "if they bear a rational relation to a legitimate governmental purpose." *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 547 (1983).  However, if they interfere with the exercise of a fundamental right, such as the First Amendment right to petition, or if they employ a suspect classification, they are subjected to a higher level of scrutiny.  *Id.*  Therefore, as part of its analysis, the Court must determine the threshold question of whether the DOC and USTR policy interferes with plaintiffs' right to petition or employs a classification that impinges upon plaintiffs' First Amendment rights.

---

[1]     There are not a lot of facts in this complaint.  The Court cannot help but observe that the initiating document in this case appears to have been drafted without much regard for the requirement in Fed. R. Civ. Proc. 8 that a complaint be a short and plain statement of the claim. Plaintiffs essentially filed a brief – complete with legal citations – and numbered the paragraphs.

## ANALYSIS

**I.      Plaintiffs have standing to challenge the policy.**

A lack of standing is a defect in subject-matter jurisdiction.  *Haase v. Session*, 835 F.2d 902, 906 (D.C. Cir. 1987).   In order to establish constitutional standing, a plaintiff must demonstrate that a case or controversy exists by showing that (1) he has suffered an "injury in fact"; (2) that the injury is "fairly traceable" to the conduct of the defendant; and (3) that it is likely that the injury will be redressed by a favorable decision.  *George v. Napolitano*, 693 F. Supp. 2d. 125, 129–30 (D.D.C. 2010), quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180–81 (2000).  Defendants here argue that plaintiffs lack standing because they have not suffered an injury in fact.  Defs.' Mot. at 15.

For standing purposes, an injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal quotation marks and citations omitted).  The Supreme Court has long recognized that injury in fact exists when a plaintiff alleges that the government has directly impacted the exercise of his First Amendment rights or where he has shown a threat of specific future harm.  *See Laird v. Tatum*, 408 U.S. 1, 13–14 (1972), citing *Ex parte Levitt*, 302 U.S. 633, 634 (1937).  Defendants point out that four of the five plaintiffs chose to remain registered lobbyists despite the consequence that they would not be given positions on the ITACs.  Defs.' Mot. at 34.  Similarly, with regard to the final plaintiff, the complaint alleges that "it is clear that Reinsch's application [to represent the National Foreign Trade Council on an ITAC] will not be accepted," Compl. ¶ 11, not that Reinsch will deregister as a federal lobbyist. So the defense takes the position that plaintiffs do not allege that the government has directly

impacted their First Amendment rights.  Defs.' Mot. at 33–34.  But the complaint as written does allege that the plaintiffs' rights have been burdened by being forced to make the choice.

Moreover, the Supreme Court has also found injury in fact where the government threatens to cause an individual a cognizable injury as a consequence of his exercise of a constitutional right.  In *Meese v. Keene*, 481 U.S. 465 (1987), the Supreme Court considered the plaintiff's motion for preliminary injunction challenging the Foreign Agents Registration Act of 1938, which would have required three Canadian films that the plaintiff wished to publicly show to be labeled "foreign political propaganda."  *Id.* at 467–68.  The defendants argued that the plaintiff lacked standing because he had not shown a direct impact to the exercise of his First Amendment right to free speech.  The Supreme Court disagreed.  It found that plaintiff – an attorney and member of the California State Senate – had standing because the law threated to cause him "cognizable injury" for choosing to exercise his constitutionally protected rights.  *Id.* at 473 (finding appellee alleged "more than a 'subjective chill'" because the consequence of exercising his right to free speech threatened to cause him cognizable injury.).  It found cognizable injury because detailed uncontradicted affidavits that plaintiff had submitted showed that "if he were to exhibit the films while they bore . . . [the label "political propaganda,"] his personal, political, and professional reputation would suffer and his ability to obtain re-election and to practice his profession would be impaired."  *Id.* (internal quotation marks omitted).

Here, plaintiffs have alleged that the DOC and USTR policy denies them the benefits of ITAC membership solely because they are involved in activities that are allegedly protected by

the First Amendment.[2]  At this juncture, the Court must assume that plaintiffs would succeed on the merits – in other words, that their activities are protected by the First Amendment, and that the deprivation violates their constitutional rights.  *See Alvin Lou Media, Inc. v. FCC*, 571 F.3d 1, 7 (D.C. Cir. 2009), citing *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003) (for purposes of standing, the court must assume that plaintiffs would prevail on the merits); *see also Meese*, 481 U.S. at 473 ("Whether the statute in fact constitutes an abridgement of the plaintiff's freedom of speech is, of course, irrelevant to the standing analysis.") (internal quotation marks, citations, and alterations omitted).  So the determinative question is whether plaintiffs have shown that the loss of ITAC membership constitutes a "cognizable injury" to them.

Plaintiffs need not show economic injury to meet the injury in fact requirement, *United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 686 (1973), but the injury must be "distinct and palpable" and the plaintiff must be among those injured.  *Id.*; *Warth v. Seldin*, 422 U.S. 490, 501 (1975).  Injury may also exist solely "by virtue of statutes creating legal rights, the invasion of which creates standing."  *Warth*, 422 U.S. at 500 (internal quotation marks omitted).  The complaint appears to assert that deprivation of ITAC membership is an injury in itself.  *See* Compl. ¶ 44 ("The exclusion of federally registered lobbyists from ITACs substantially burdens First Amendment rights by denying the benefit of committee service to individuals . . .").

---

2       The Court has some concerns about whether plaintiff Reinsch's injury is sufficiently "imminent" since he has not yet applied for ITAC membership; however, if standing can be shown for at least one plaintiff, the  Court "need not consider the standing of the other plaintiffs to raise that claim."  *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996) (citation omitted).

Neither the complaint nor the initial briefing dwelled in much detail on the specific personal harm that could flow from the deprivation of ITAC membership.[3]   However, at the motions hearing on this matter, attorney for plaintiffs asserted that ITAC service provides the benefit of boosting the member's resume.   Draft Transcript ("Tr.") at 23–24.   Counsel also explained that service on an ITAC gives the individual a sense of "professional satisfaction," "valuable expertise," "enjoyable experience," "valuable experience and education," "professional contacts," and "the satisfaction of making a contribution."   *Id.* at 21, 30; Pls.' Supp. Br. in Opp. to Def.'s Mot. to Dismiss ("Pls.' Supp. Br.") [Dkt. # 14] at 3.   These assertions are certainly not the "detailed affidavits" that the Supreme Court relied on to find injury in fact in *Meese*, but the Court finds that they suffice to require it to go on and address the matter on the merits.

In addition, plaintiffs have sufficiently alleged injury in fact for their equal protection claim (Second Cause of Action).   "The injury in fact in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate

---

3       The complaint claims that the policy "interfer[es] with the ability of the entities that seek the services of these lobbyists to communicate their views to the government."   Compl. ¶ 44. However, harm to the entities that the lobbyists represent is irrelevant to the analysis of whether plaintiffs have standing in their own capacities.   *See Warth v. Seldin*, 422 U.S. 490, 501 (1975) ("[P]laintiff must allege a distinct and palpable injury to himself[.]").   Plaintiffs are not asserting associational standing on behalf of those entities.   The complaint also claims that the policy gives them special access to information, but plaintiffs admit that "ITAC members are forbidden from distributing classified or otherwise non-public information to non-members, even when those non-members work for the same organization as the ITAC member."   Pls.' Mem. in Opp. to Defs.' Mot. to Dismiss ("Pls.' Opp.") [Dkt. # 9] at 4 n.2.   Since the ITAC member can only use that non-public information for purposes of the ITAC, the only benefit that access provides is linked to the effectiveness of the member in his role as an ITAC member.   That in turn benefits the entity that the member represents and the government, not the member himself.   *See id.* at 4 (explaining that access to non-public information benefits both the government and private industry).   Therefore, the Court does not find it appropriate to consider either of these characteristics of ITAC service in assessing plaintiffs' standing.

inability to obtain the benefit." *Gratz v. Bollinger*, 539 U.S. 244, 262 (2003) (internal quotation marks and alterations omitted).  Plaintiffs' second cause of action alleges that the exclusion of federally registered lobbyists from ITACs violates the equal protection clause of Fifth Amendment because it puts those who are exercising their right to petition the government on a different footing than those who are not.  Compl. ¶ 53.  This, along with the above-mentioned allegations that the deprivation of ITAC service constitutes at least a minimal injury, satisfies the injury in fact requirement, as set out in *Gratz*.

It is undisputed that plaintiffs' injuries are fairly traceable to defendants – the agencies that issued and implement the policy – and will be redressed by a favorable decision – plaintiffs will regain the same opportunity to serve on the ITACs as other similarly qualified applicants. Therefore, the Court finds that plaintiffs have standing to challenge the DOC and USTR policy under both the First and Fifth Amendments of the Constitution of the United States.

## II.     The Policy Does Not Interfere with Plaintiffs' First Amendment Right to Petition the Government for a Redress of Grievances as alleged in the First Cause of Action.

Plaintiffs seek the opportunity to advise the government as industry sector representatives on ITACs. They claim that the ban on service by federally registered lobbyists offends the Constitution, in particular, the provision in the First Amendment that provides:  "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the government for a redress of grievances."  U.S. Const. amend. I.

But in the case that is most analogous to the instant situation, *Minn. State Bd. for Cmty. Colls. v. Knight*, 465 U.S. 271 (1984), the Supreme Court held unequivocally that the Constitution does not grant members of the public any particular right to be heard by public bodies making policy decisions.  *Id.* at 283.

> Public officials at all levels of government daily make policy decisions based only on the advice they decide they need and choose to hear. To recognize a constitutional right to participate directly in government policymaking would work a revolution in existing government practices.

*Id.* at 284.  Thus, plaintiffs have no legal entitlement to ITAC service.

*Knight* involved a challenge to the Minnesota Public Employment Labor Relations Act ("PELRA").  The statute provided that if professional employees had selected an exclusive representative for mandatory bargaining, their employer could then choose to exchange views on other employment-related questions, not subject to mandatory bargaining, with the exclusive representative only.  *Id*. at 276–77 & 277 n.4.  This formal exchange of views on other topics was called the "meet and confer" process.  *Id.* at 276.

The Minnesota Community College Faculty Association ("Faculty Association") had been designated the exclusive representative for the faculty of the state's community colleges, so under the PELRA, only members of the Faculty Association could "meet and confer" with the State Board.  *Id.* at 273–74.  The appellees – community college faculty instructors who were not members of the Faculty Association – challenged this provision as violating their First Amendment rights to speak, associate, and petition the government by depriving them of a fair opportunity to participate in the selection of their representatives.  *Id.* at 278–79.

As noted above, the *Knight* opinion explained that it was a well-settled constitutional principle that the instructors had no right to be heard by government bodies making policy determinations.  But in addition, the Court went on to reject the argument that the "meet and confer" provision impaired the teachers' constitutional right to free association by exerting pressure on them to join the Faculty Association:

> Appellees may well feel some pressure to join the exclusive representative in order to give them the opportunity to serve on the 'meet and confer' committees or to give them a voice in the representative's adoption of positions on particular issues.  That pressure, however, is no different from the pressure they may feel to join [the Faculty Association] because of its unique status in the 'meet and negotiate' process, a status the Court has summarily approved.  Moreover, the pressure is no different from the pressure to join a majority party that persons in the minority always feel.  Such pressure is inherent in our system of government; it does not create an unconstitutional inhibition on associational freedom.

*Id.* at 289–90.

Plaintiffs do not dispute that under *Knight*, they have no constitutional right to ITAC membership.  Pls.' Opp. at 14.  So in an effort to avoid the obvious effect that *Knight* would have on this case, they do not cast their complaint as alleging a deprivation of any "right" to serve on an ITAC.  Pls.' Opp. at 15–16.  Instead, they cite the doctrine of unconstitutional conditions, on which *Perry v. Sinderman*, 408 U.S. 593 (1972), is the seminal case.  Pls.' Opp. at 16.  They maintain that the government has placed an unconstitutional condition on the receipt of the "benefit" of ITAC membership.  *Id.*  In the Court's view, this argument is foreclosed by *Knight* as well, because it is simply a reformulation of the *Knight* plaintiffs' argument that the rule makes the decision to exercise one's First Amendment rights more difficult and pressures the plaintiffs to choose a particular path of self-expression because certain undesirable consequences will flow from another.

But even if *Knight* is not the beginning and the end of the matter, then the question before the Court, as the plaintiffs have framed the controversy, is whether this case actually fits within the *Perry* rubric.  The Court finds that both of the necessary prongs are missing.

In *Perry*, the Supreme Court held that "even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons . . . [i]t may not deny a benefit to a person on a basis that infringes his constitutional

protected interests – especially, his interest in freedom of speech." *Perry*, 408 U.S. at 597.  That

seems clear enough, but as one commentator has observed, the Supreme Court's decisions

applying the unconstitutional conditions doctrine "seem a minefield to be traversed gingerly."

Kathleen Sullivan, *Unconstitutional Conditions*, 102 Harv. L. Rev. 1413, 1415 (1988).

However, the cases are consistent in articulating the key concern underlying the doctrine:  "if the

government could deny a benefit to a person because of his constitutionally protected speech or

associations, his exercise of those freedoms would in effect be penalized and inhibited." *Perry*,

408 U.S. at 597; *see also Speiser v. Randall*, 357 U.S. 513, 518–19 (1958) (finding the denial of

a tax exemption for engaging in certain kinds of speech a violation of the First Amendment

because it "necessarily will have the effect of coercing the claimants to refrain from the

proscribed speech.").  Here, plaintiffs' unconstitutional condition argument fails because the

complaint does not support a finding that service on an ITAC is a valuable government benefit.

More important, the complaint does not allege that ITAC service is being denied to the plaintiffs

"because of" their constitutionally protected activities, or that plaintiffs' constitutional right to

petition the government has actually been abridged.

      a.   <u>ITAC membership is not a valuable government benefit.</u>

The Supreme Court has recognized tax exemptions, unemployment benefits, welfare

payments, and public employment as valuable government benefits that cannot be withdrawn as

a consequence of an individual's exercise of his First Amendment rights.  *See Perry*, 408 U.S. at

597.  In each of these contexts, the plaintiffs were deprived of a nontrivial economic benefit.  *Id.*

And although neither the Supreme Court nor this Circuit has required the benefit in an

unconstitutional conditions claim to have measurable economic worth, the precedent is clear that

the benefit must be in some way "valuable," such that its deprivation would burden the exercise of one's First Amendment rights.[4]  *Perry*, 408 U.S. at 597.

Yet the complaint is devoid of any factual assertions indicating that ITAC service *is* a valuable government benefit for the particular individuals functioning as the industry sector representatives.  The First Cause of Action simply contains the conclusory allegation that the exclusion of federally registered lobbyists from ITACs burdens First Amendment rights by denying "the benefit of committee service" to those individuals.  Compl. ¶ 44.  In their opposition to the motion to dismiss, plaintiffs acknowledge that "[t]he ITACS are designed to provide a host of benefits to the government," Pls.' Opp. at 3, and they go on to claim that "ITAC members also gain significantly from their privileged positions."  *Id*; *see also id.* at 6.  ("ITAC membership provides numerous irreplaceable benefits to individuals, in addition to the benefits the government gains from receiving their advice.")  However, the opposition does little to elaborate further.  It states that "[a]s a necessary condition of the role they play, ITAC members have access to sensitive business, trade, and other information not available to the general public," *id.* at 3 (internal quotations omitted), and it characterizes this special access as "invaluable and irreplaceable."  *Id.*  It also quotes the Special Counsel to the President, who described ITAC membership as "unique."  *Id.* at 4 n.3.

---

4.      Plaintiffs also point to *Davis v. Federal Election Commission*, 554 U.S. 724, 738 (2008). Pls.' Opp. at 15.  In *Davis*, the Court found that a federal law that maintained the pre-existing cap on receipt of individual contributions for those political candidates whose personal contributions exceeded a certain amount  – while trebling that cap for those who could not self-finance – impermissibly burdened the First Amendment right of the well-heeled candidate "to spend his own money for campaign speech."  *Id.*  The statute "produce[d] fundraising advantages for opponents in the competitive context of electoral politics" and required candidates who wanted to self-finance their campaigns to "shoulder a special and potentially significant burden."  *Id.* at 739.  The statute in question in *Davis* thus had real economic consequences for the candidates that the Court found had the effect of burdening their First Amendment rights.  Thus, the case does little to illuminate the question at issue here.

When the Court raised the matter at oral argument, counsel struggled to articulate what the benefit might be:

> The Court:  What is the benefit here?  What are the facts that you've alleged in your complaint from which I can draw the inference that this is even a benefit?
>
> [Counsel for Plaintiffs]:  I think the nature of service on the ITAC necessarily carries with it a whole constellation of not easily quantifiable but very real benefits.  If someone serves on an ITAC, they get valuable expertise, they get experience, they get a resume enhancing characteristic, they get an enjoyable experience, they get something that they would like to do.  All of those things are personal benefits both for standing purposes and for purposes of satisfying the unconstitutional conditions doctrine.
>
> \*       \*       \*
>
> The Court:  Well, what's your response to the answer that, no, the point of the committee is to benefit the decision makers and to benefit the quality of the decision, and ultimately I guess the public and the marketplace.  The point of this is not to benefit the people that are on it, and in fact, they don't even serve in their personal capacity, they serve as, okay, you're the airline sector and you're the pharmaceutical sector.  So how does it have an individual benefit at all?
>
> [Counsel for Plaintiffs]:  Well, it certainly is a case that ITACs were not created for the purposes of benefitting the individual ITAC member.  But exactly the same thing is true of the government employment.  The Department of Justice was not created by Congress to create employment opportunities for DOJ employees, it was created to help the President effectuate, carry out the laws of the United States, just as ITACs were created to help the President formulate trade policy.  That doesn't mean that persons who serve in the Department of Justice don't obtain a personal benefit from doing that that's relevant for purposes of the unconstitutional conditions doctrine.
>
> I think the same thing is true of ITAC membership.  The fact that people are anxious to serve, the fact that the plaintiffs here brought this litigation, because they are anxious to serve as ITAC members, shows I think that they get what they regard as a personal benefit.  It's a desirable characteristic, it's a desirable opportunity that's provided by the government to people unless they exercise their Constitutional rights to petition and speak.  And that is exactly what we think triggers application, generally speaking, of the unconstitutional conditions doctrine.
>
> The Court: So just being a desirable thing is enough?

> [Counsel for Plaintiffs]:  Well, not in the air.  But as I say, it's difficult to quantify the benefits in an economic sense, but I think there can be no question that just as with an internship, it provides benefits . . . .

Tr. 21:1–12, 22:8–23:17.   Ultimately, plaintiffs took the position that "any opportunity the government provides" could suffice to trigger the unconstitutional conditions analysis.   Tr. at 26.[5]

Under *Iqbal*, the Court need not accept the "naked assertion" that ITAC membership is beneficial, without any factual allegations to support it.   556 U.S. at 678 (2009); *see also Twombly*, 550 U.S. at 570 (a pleading must offer more than "labels and conclusions").   Plaintiffs

---

5      Plaintiffs proffer little support for this expansive interpretation. Plaintiffs quote from the Eight Circuit's opinion in *Cuffley v. Mickes*, 208 F.3d 702 (8th Cir. 2000), which cited *Perry* and then stated in dicta in a footnote that "[t]his 'unconstitutional conditions' doctrine is not limited to valuable government benefits or even benefits at all." Pls.' Supp. Br. at 3, *quoting Cuffley*, 208 F.3d at 707 n.5.   But *Cuffley* does address the question directly or elaborate on that observation in any meaningful way.   Instead, the opinion goes on to say:  "The Supreme Court has held that a legal entitlement to a position or program is not necessary in order to assert an unconstitutional conditions claim." *Cuffley*, 208 F.3d at 707 n.5.  This somewhat narrows the prior statement.   In any event, *Cuffley* involved viewpoint suppression.

do not allege that committee membership is a form of public employment,[6] and they do not allege that ITAC membership has any economic consequences for the member, in the way that jobs, tax exemptions, unemployment benefits, or welfare payments confer clear economic benefits on the recipient. Pls.' Opp. at 11–12; *see also* 75 Fed. Reg. 24584, 24585 (May 5, 2010) ("Members serve without compensation and are responsible for all expenses incurred to attend the meetings.").   In their opposition to defendants' motion to dismiss, plaintiffs assert that membership would afford them special access to sensitive business, trade, and other information not available to the general public, Pls.' Opp. at 4, but is this the sort of "valuable government benefit" contemplated by *Perry*?  Plaintiffs concede that any non-public information that ITAC members receive access to may be used only for purposes of the committee, *id.* at 4 n.2, so that aspect of service cannot logically constitute the personal benefit.  *See supra* note 3.  Plaintiffs also submit that timely access to sensitive information is beneficial because it allows the member

---

6        It may be that plaintiffs do not specifically characterize ITAC membership as government employment because treating plaintiffs like government employees would require the Court to subject the policy to less scrutiny than it would if plaintiffs were treated like ordinary citizens. *See, e.g.*, *Kinney v. Weaver*, 367 F.3d 337, 357–60 (5th Cir. 2004).  Because the government has no legitimate interest in denying a benefit to "ordinary citizens" on account of their speech on matters of public concern, there is no interest balancing involved in the First Amendment analysis for "ordinary citizen" cases.  *See Pickering v. Board of Educ.*, 391 U.S. 563, 568–69 (1968).  Rather, the First Amendment is violated in "ordinary citizen" cases if the individual engaged in conduct protected by the First Amendment and the government took action against the person because of that protected conduct.   *Id.*  But "[i]n 'governmental employee' cases, by contrast, courts must be attentive to the '[t]he government's interest in achieving its goals as effectively and efficiently as possible,' which interest 'is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer.'"  *Kinney*, 367 F.3d at 358, quoting *Waters v. Churchill*, 511 U.S. 661, 675, (1994) (plurality opinion).  In cases involving retaliation against public employees for protected speech, therefore, courts are required to balance the government's need "to find a compromise between the rights of public employees to free speech and of the government to regulate its workplace."  *Hyland*, 972 F.2d at 1137; *see also Pickering*, 391 U.S. at 573–74; *Connick v. Myers*, 461 U.S. 138, 145–54 (1983).  Accordingly, they employ the "public concern" test, under which only speech that addresses a matter of public concern is protected from employment-related consequences.  *See Pickering*, 391 U.S. at 572–74; *Connick*, 461 U.S. at 145–48.

to "identify and correct potential flaws" in trade agreements, which in turn "benefit[s] both the government and private industry." Pls.' Opp. at 4. But there too, plaintiffs are not alleging that this feature of service is beneficial to *them*. Indeed, the statute provides that ITAC members are selected to serve as representatives of certain industry sectors or functional areas. 19 U.S.C. § 2155(c). So the benefit of providing good advice to the government inures to the industry that the member represents, and the country at large, but not to the member himself.[7]

So we are left with the assertions that membership is a "desirable" "resume-booster," that provides an "enjoyable experience" and "valuable expertise," and affords special access to government decision-makers which might enable members to build relationships that could benefit them in representing lobbying clients in the future (and these allegations do not even appear in the complaint). Tr. at 21, 30. At bottom, plaintiffs seem to suggest that being able to tout their status as government insiders and advisors will enhance their ability to attract lobbying clients in the future and advance their goals.

But even if ITAC service is desirable because it burnishes a member's professional credentials and fattens his or her rolodex (or today, his "Contacts"), the value of that opportunity is not easily equated to the obvious worth of the governmental benefits that have been recognized by the Supreme Court. The loss of the ability to feature ITAC service on a resume does not come close to imposing the type of burden involved in losing one's job, unemployment benefits, welfare payments, or tax exemptions. And it cannot be equated with the situation in

---

7    In addition, the policy at issue here does not prevent the entity from being represented on an ITAC; it only prevents the entity from using a particular individual as its representative.

*Davis,* where the challenged law required the plaintiffs to "shoulder the specially and potentially significant burden," of a fundraising disadvantage in an election campaign.  554 U.S. at 73.[8]

Plaintiffs have not identified any case in which a court has specifically found an uncompensated advisory position to be a "valuable government benefit" for purposes of the unconstitutional condition analysis.  At the hearing, they likened the policy to withholding an unpaid government internship, Tr. at 22:1–7, 31:16–21, and in the supplemental pleading they filed after the hearing, they pointed the Court towards authorities according First Amendment protection to interns and state or municipal volunteers, Pls.' Supp. Br. at 1–4.  But the cases they cite are not Supreme Court or D.C. Circuit decisions, the language relied upon is generally found in dicta, the facts are distinguishable, and most of those courts either assumed without deciding that volunteers get First Amendment protection or they relied, at least in part, on state statutes that specifically required that the volunteers be treated as municipal employees.  *See, e.g.*, *Barton v. Clancy,* 632 F.3d 9, 24–26 (1st Cir. 2011) (surveying the case law, and then leaving the

---

8       Plaintiffs also cite *Dolan v. City of Tigard*, 512 U.S. 374 (1994) for the proposition that the Supreme Court has recognized a building permit as a valuable governmental benefit for purposes of the unconstitutional conditions doctrine.  *See* Pls.' Opp. at 16.  However, *Dolan* concerned the government's ability to exact conditions on a land use permit, which is governed by a different test than the one at issue here:  it requires the court to look at the relationship between the conditions imposed and the benefit conferred by the permit.  *See Dolan*, 512 U.S. at 385–391; *see also Lingle v. Chevron, USA Inc.*, 544 U.S. 528, 547 (2005) (referring to *Dolan* as involving a "special application of the 'doctrine of unconstitutional conditions.'").  Moreover, even if the Court were to consider the Supreme Court's analysis in *Dolan* to be applicable to this case, the benefit at issue in *Dolan* was a building permit that would have allowed the permit holder to greatly increase the value of his land.  *See* 512 U.S. at 379–80.  This type of economic benefit is not present in this case.

decision for another day);[9] *see also Hyland v. Wonder*, 972 F.2d 1129 (9th Cir. 1992) (applying the analytical framework for employees to an unpaid volunteer, because the volunteer position was "high level"; plaintiff had at times been compensated for the same work; plaintiff's manager promised to exert his best efforts to find further funding for the position; and plaintiff had been expected to continue in the position until he could qualify for a paid position);[10] *Anderson v. McCotter*, 100 F.3d 723, 727 (10th Cir. 1996) (treating intern, who received some compensation and college credit for her experience, as an employee, but observing in dicta that even if the Court considered the plaintiff to be a nonpaid volunteer, she would still be entitled to First Amendment protection).

There is something very different in nature between the volunteer positions involved in those cases and what we have here, which is much closer to the situation that gave the Supreme Court no qualms in *Knight*. For one thing, the plaintiffs in the cited cases were asking the courts to treat them as public employees, and the plaintiffs here are not. Second, those plaintiffs alleged specific facts that supported a finding that the positions were beneficial to them personally, while

---

9       "In sum, the Second, Seventh, and Ninth Circuits have found that volunteer positions are entitled to constitutional protection; however, these cases have relied in part, either directly or indirectly, on state statutes which mandate that such volunteers be treated as employees. The Tenth Circuit, albeit in dicta, has concluded that volunteers enjoy First Amendment protection without reliance on any such state statute. The Third Circuit, like this circuit, has assumed without deciding that a public volunteer position is a valuable government benefit, the deprivation of which can trigger First Amendment scrutiny. At the same time, no court has held that volunteers are not protected by the First Amendment." *Barton*, 632 F.3d at 25–26.

10      It is true that the *Hyland* court also observed in dicta: "as a government volunteer, a person gains valuable experience and education in public administration[,] can make professional contacts," and gains the satisfaction of making a contribution to society." 972 F.2d at 1135–36. However, as the *Barton* court documented, *Hyland* relied in part on another case – *Janusaitis v. Middlebury Volunteer Fire Dep't*, 607 F.2d 17 (2d Cir. 1979) – and it failed to take into consideration that in *Janusaitis*, state law required that the volunteer position at issue be treated as equivalent to public employment for certain purposes. *Id.* at 21; *see also Barton*, 632 F.3d at 25.

the plaintiffs here desire to serve in a representative capacity only.  ITAC positions were created for the sole purpose of advising the government, *see* Compl. ¶ 28, citing 19 U.S.C. § 2155(d) ("The Trade Act established ITACs for the purpose of soliciting the 'policy advice, technical advice and information, and advice on other factors' from industries that have an interest in U.S. trade policy."), and they do not have the characteristics of employment that these courts have found to be dispositive.  And, unlike internship positions, ITAC membership slots are not created for the purpose of providing education or experience to the position holder.

For all of these reasons, the Court concludes that ITAC membership is not a valuable government benefit for purposes of the *Perry* analysis.

### b. The government's policy does not deny ITAC membership on a basis that infringes plaintiffs' First Amendment right to petition the government.

Furthermore, the cases plaintiffs rely upon are distinguishable because they all involve a penalty exacted or sanction imposed *in retaliation for* the exercise of a First Amendment right – in each case, speech.  The plaintiff in *Hyland*, who worked in the San Francisco Juvenile Probation Department, was terminated specifically because he circulated a memorandum to the judges supervising the juvenile court detailing alleged incompetence in the management of a facility called Juvenile Hall.  972 F.2d at 1129.  The plaintiff in *Barton* alleged that the mayor of Lynn, Massachusetts declined to reappoint him to his position on the Parks Commission in retaliation for his outspoken criticism of the mayor as the representative of the firefighters' union and his participation in multiple lawsuits against the city.  632 F.3d at 11.  Ms. Andersen, the intern at a facility managed by the Utah Department of Corrections, was fired the day after she appeared in a televised interview expressing her opinions about the Department's announced changes to its sex-offender treatment program.  *Anderson*, 100 F.3d at 725.  There is nothing like that alleged here.  First of all, this case does not involve speech.  *See Perry,* 408 U.S. at 597 (The

government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests – *especially, his interest in freedom of speech.*") (emphasis added).  And there is absolutely no allegation that plaintiffs were asked to leave or avoid the ITAC because of the content of anything they expressed, who they lobbied for, or any particular position they advanced on behalf of their clients.[11]  So even if the cases plaintiffs cite compel the conclusion that feeling good about one's special access to the corridors of power elevates ITAC membership to the status of a valuable government benefit, the situation would not be analogous here because the cases they cite all involve the clear imposition of a penalty for engaging in particular acts of constitutionally protected expression.

Furthermore, Supreme Court precedent distinguishes between government actions that impose a penalty and those that deny a subsidy.  *See Regan*, 461 U.S. at 545, 549–50.  In *Regan*, the Supreme Court upheld a federal law that barred section 501(c)(3) non-profit organizations from using tax-deductible contributions to support lobbying.  *Id.* at 550–51.  The Court found that Congress simply "chose not to subsidize lobbying as extensively as it chose to subsidize other activities that non-profit organizations undertake to promote the public welfare."  *Id.* at 544.  This did not violate the First Amendment because "Congress is not required by the First Amendment to subsidize lobbying."  *Id.* at 546.  The Supreme Court reasoned that the government's rule did not deny an organization "any independent benefit on account of its intention to lobby."  *Id.* at 545.  It merely declined to confer the resources "necessary to realize all the advantages" of their First Amendment freedom.  *Id.* at 550; *see also Lyng v. Int'l Union, UAW*, 485 U.S. 360, 369 (1988) ("[T]he statute challenged in this case requires no exaction from

---

11      This also distinguishes the case from *Cuffley*, where the court found that the state was in fact penalizing the Ku Klux Klan for expressing its viewpoint when it turned down its adopt-a-highway application.  208 F.3d at 706 n.3, 711–12.

any individual; it does not 'coerce' belief; and it does not require appellees to participate in political activities or support political views with which they disagree.  It merely declines to extend additional food stamp assistance to striking individuals simply because the decision to strike inevitably leads to a decline in their income.").[12]

Here, the government's refusal to allow registered lobbyists to serve on ITACs may make it more difficult for plaintiffs to make the kinds of contacts within the government that could improve their effectiveness as lobbyists and it may deny them the opportunity to tout those connections and enhance their business generation.  But the government is not required to help plaintiffs "realize all the advantages" of their lobbying activity.  The benefits that plaintiffs claim they are being denied – *i.e.*, special access to government decision-makers and a chance to get the first peek at new policy initiatives – are perquisites of service that could make their lobbying more effective and more lucrative.  Although plaintiffs may aspire to obtain this privileged access in order to advance their clients' interests and their own careers, *Regan* teaches that the First Amendment does not require the government to, in effect, underwrite plaintiffs' petitioning activity by providing them with those advantages.

So, in the absence of any allegation of retaliatory action or penalty, what is the infringement of First Amendment rights that is alleged in this case?  How were plaintiff's rights abridged?  Count I alleges that "[t]he exclusion of federally registered lobbyists from ITACs substantially burdens First Amendment rights by denying the benefit of committee service to individuals *whose exercise of the right to petition triggers the LDA's registration requirement*, while also interfering with the ability of the entities that seek the services of these lobbyists to

---

12    In *Lyng,* the Court found that although the government's refusal to extend food stamp benefits made it more difficult for workers to maintain their strikes, "we are not inclined to hold that the right of association requires the Government to minimize that result by qualifying the strikers for food stamps."  *Id.* at 368.

communicate their views to the government."  Compl. ¶ 44 (emphasis added).  The second prong of that assertion does not allege any injury suffered by the plaintiffs.  And the first part of the claim reveals the problem at the heart of this case.

In *Perry*, the Supreme Court explained that what makes the conditioning of a benefit on the surrender of a right unconstitutional is the potential it has to inhibit or penalize constitutional expression.  408 U.S. at 597.  But the allegations in plaintiffs' complaint do not support the notion that the challenged restriction on ITAC service either penalize or inhibit First Amendment expression.   Indeed it is plaintiffs' own efforts to detail why the policy is under-inclusive, ineffective, or simply bad policy that reveal why it is not unconstitutional.

The complaint expressly alleges that the policy does not curtail protected activity. "[I]ndividuals permitted to serve on ITACs are free to – and may well – engage in more lobbying activity than the registered lobbyists excluded from service on the ITACs." Compl. ¶ 36. The complaint reports that 1,691 lobbyists deregistered between April and November 2009, but it goes on to allege that "these deregistrations likely do not reflect a reduction in lobbying activity, but rather a restructuring of lobbying activities to remain beneath the LDA's twenty percent registration threshold."  Compl. ¶ 39.[13]  So, while the First Cause of Action insists that the government may not "condition ITAC membership on plaintiffs' agreement to forego lobbying efforts . . . [,]" Compl. ¶ 49, plaintiffs have also asserted that in fact, the challenged policy does not do so.  The complaint makes it clear that the statutory duty to register is not directly correlated with the amount, nature, or content of any lobbyist's protected activity, *see* Compl. ¶¶ 22, 36, and that those who lobby may indeed serve, Compl. ¶ 36.

---

13    The disclosure provisions in a prior version of this statue were upheld by the Supreme Court as constitutional in *United States v. Harriss*, 347 U.S. 612 (1954).

Because the government's policy does not retaliate against or penalize plaintiffs for the exercise of their rights, and it does not abridge their right to petition the government, the Court finds that the government's policy does not interfere with plaintiffs' First Amendment rights and that it need not be subjected to heightened scrutiny.

### III.   The Policy Does Not Employ a Classification that Impinges Upon Plaintiffs' Constitutional Rights as Alleged in Count Two.

Plaintiffs' second cause of action advances the conclusory allegation that the policy "draws an unconstitutional distinction between those who exercise their right to petition the government and those who do not."   Compl. ¶ 53.   Plaintiffs maintain that since the policy supposedly employs this suspect classification, it must be subjected to a heightened level of scrutiny.   Pls.' Opp. at 23; *see Regan*, 461 U.S. at 547.   But this contention fails because the policy does *not* distinguish between those who exercise their right to petition the government and those who do not.   An individual can petition the government endlessly on his or her own behalf and still secure a seat on an ITAC.   More importantly, the complaint specifically alleges that one can freely engage in lobbying activity and still serve on the committee.   Compl. ¶ 36 ("[I]ndividuals permitted to serve on ITACs are free to – and may well – engage in more lobbying activity than the registered lobbyists excluded from service on the ITACs.").   Thus, the facts set forth in the complaint do not support a conclusion that would trigger the higher level of scrutiny.   The policy differentiates only between those whose lobbying activities trigger the statutory registration requirement and those whose activities do not, and plaintiffs do not allege and they did not argue that those triggering circumstances – as opposed to the lobbying activities themselves – are constitutionally protected.

Moreover, the Court has already found that the government's policy has no substantial impact on any fundamental interest, so it cannot find that it employs a classification that

impinges upon a fundamental interest. *See Perry Educ. Ass'n. v. Perry Local Educators' Ass'n*, 460 U.S. 37, 54 (1983) (where the plaintiffs did not have a First Amendment right to access an interschool mail system, the denial of such access to them did not classify them in a way that impinged upon a fundamental interest: "We have rejected this contention when cast as a First Amendment argument, and it fares no better in equal protection garb"); *Lyng*, 485 U.S. at 370 (where a statute has no substantial impact on a fundamental interest, the classification does not garner heightened scrutiny under an Equal Protection analysis); *Knight*, 465 U.S. at 291 (same).[14]

Therefore, the Court will review the policy utilizing the rationality review approach.

## IV.     The Policy is Rationally Related to a Legitimate Governmental Interest.

Under rationality review, the government's policy must be upheld if it is "rationally related to a legitimate government purpose." *Engquist v. Or. Dep't of Agr'c*, 553 U.S. 591, 608 (2008). The rationale may be "based on rational speculation unsupported by evidence or empirical data" and "the burden is on the one attacking [the policy] to negate every conceivable basis which might support it . . . whether or not the basis has a foundation in the record." *Heller v. Doe by Doe*, 509 U.S. 312, 320–21 (1993) (internal quotation marks and citations omitted). The government policy may be upheld even where the "assumptions underlying the[] rationales

---

14      At the motions hearing in this case, counsel for plaintiffs directed the Court to *Police Dep't of the City of Chi. v. Mosley*, 408 U.S. 92 (1972) for the proposition that even if the Court finds that heightened scrutiny is not warranted under the First Amendment, it should still find it warranted by the Equal Protection Clause of the Fifth Amendment. Tr. at 43. *Mosely*, however, does not stand for that proposition. There, the Supreme Court did not even undergo a First Amendment analysis. Rather, it found through the Equal Protection analysis that the ordinance warranted heightened scrutiny because the classification was based on the content of picketers' speech. Moreover, the Court suggested that it would have also found the ordinance to warrant heightened scrutiny under the First Amendment. *See Mosley*, 408 U.S. at 96 ("Necessarily, then, under the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views.").

may be erroneous . . . . [T]he very fact that they are arguable is sufficient, on rational basis review, to immunize the . . . choice from constitutional challenge." *Id.* at 333 (internal quotation marks, citations, and alterations omitted).

The government puts forward three rationales for its policy. It argues that:

(1) The policy seeks to reduce the influence of special interests in government;

(2) The policy is designed to increase public confidence in government, which is under the threat of being undermined by the influence of special interests in government; and

(3) Federal advisory committees and commissions can aid the government's policymaking more effectively if their members are not individuals from whom the government already routinely receives input and who already have significant access to government officials.

Defs.' Mem. at 36–38.

Plaintiffs do not dispute that reducing the influence of special interests in government is a legitimate state purpose. *See United States v. Harriss*, 347 U.S. 612, 625–26 (1954) (preventing the "voice of the people" from being "drowned out by the voice of special interest groups seeking favored treatment while masquerading as proponents of the public weal" is a vital public interest); *see also Nat'l Ass'n of Mnfrs. v. Taylor*, 582 F.3d 1, 14 (D.C. Cir. 2009), quoting *Buckley v. Valeo*, 424 U.S. 1, 66 (1976) (governmental interests are particularly important where "'the free functioning of our national institutions' is involved"). Rather, they challenge the notion that the policy is properly crafted to effectuate its purpose. *See* Compl. ¶¶ 36–41. The Court concludes that the government's first rationale satisfies rational basis review.[15]

---

15      Plaintiffs also argue that rational basis review might not be appropriate at the motion to dismiss stage because it "often involves significant factual analysis." Pls.' Opp. at 22. In this case, however, since the Court finds a rational basis for the policy based on the facts alleged in the complaint, with all inferences drawn in the favor of plaintiffs, there is no tension between rational basis review and the Rule 12(b)(6) standard. *See Iqbal*, 556 U.S. at 679.

The government reasonably could have believed federally registered lobbyists on ITACs would meet and form relationships with government policymakers, which they could then exploit to gain special influence for their clients.  It was also reasonable for the government to single out federally registered lobbyists as particularly captured by special interests because those individuals engage in a substantial amount of lobbying for at least one client, and are paid for their services.  Plaintiffs are correct that the policy does not exclude all individuals who engage in lobbying the government on behalf of special interests because the lobbying activities of some individuals will not trigger registration under the LDA.  Compl. ¶ 36.  However, those that the policy does exclude are *all* engaged in lobbying on behalf of special interests.  So, the government could reasonably believe that barring at least those individuals from serving would reduce the influence of individuals who engage in a substantial amount of paid lobbying for clients.  This in turn would reduce the influence of special interests in government by some margin.  Underinclusiveness is not a basis for invalidating a statute under rational basis review because Congress "may choose to proceed one step at a time, applying remedies to one phase of one field while neglecting the others."  *Kaemmerling v. Lappin*, 553 F.3d 669, 685 (D.C. Cir. 2008).

Furthermore, it is insignificant that some federally registered lobbyists may restructure their lobbying activities to remain beneath the LDA's twenty percent registration threshold or that the government's allegedly lax enforcement of LDA registration requirements may lead bad actors to flout the law by declining to register even though they meet the registration requirements.  *See*  Compl. ¶¶ 39–40.  The government's rational basis for enacting its policy is not overcome by the possibility that "creative and determined lobbyists [may] succeed in finding and exploiting another loophole."  *Taylor*, 582 F.3d at 18.

The Court need only find one of plaintiffs' rationales sufficient.  However, it notes that the policy advances the second purpose for the same reasons that it at least partially accomplishes the first purpose.  And indeed, plaintiffs' argument that ITAC service is a benefit because it helps them market themselves as real government insiders just proves the point that the government could reasonably believe that excluding lobbyists from ITAC services would increase public confidence that government is not being overtaken by insiders.

## V.      CONCLUSION

Because the DOC and USTR policy does not offend the Constitution, and it is rationally related to a legitimate government aim, the Court will grant defendants' motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).  A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  September 26, 2012